# United States Tax Court

T.C. Memo. 2023-126

STEPHEN R. KELLEY AND ISABELLE KELLEY,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 15069-19.                          Filed October 23, 2023.

_____

Stephen R. Kelley and Isabelle Kelley, pro sese.

*Robert P. Brown*, *Peter N. Tran*, and *Gordon P. Sanz*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: Petitioners, Stephen and Isabelle Kelley, reported zero gross income and zero taxable income on their 2017 joint federal income tax return. On the basis of third-party information returns indicating that the Kelleys received taxable income in 2017, the Commissioner of Internal Revenue (Commissioner) determined a deficiency and, in his Answer, asserted an accuracy-related penalty under section 6662(a) and (b)(1)[1] for negligence or disregard of rules or regulations. At trial and on brief, the Kelleys contested the procedural validity of the notice of deficiency, the legal accuracy of the information returns, the Commissioner's grounds for the penalty, and whether the penalty was properly authorized.

_____

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[*2]                    FINDINGS OF FACT

The Kelleys were residents of Texas when they timely filed their Petition.

Mr. and Mrs. Kelley each hold master's degrees in geology and worked as geologists in 2017. Mr. Kelley worked for Sanchez Oil and Gas Corp. (Sanchez Oil & Gas), Mrs. Kelley for Core Laboratories LP (Core Labs). Mr. Kelley received $176,273 in compensation from Sanchez Oil & Gas in 2017, from which $42,135 was withheld for federal income tax. Sanchez Oil & Gas reported this information to Mr. Kelley and the Internal Revenue Service (IRS) using Form W–2, Wage and Tax Statement. Mrs. Kelley received $149,763 in compensation from Core Labs in 2017, from which $33,610 was withheld for federal income tax. Core Labs reported this information to Mrs. Kelley and the IRS using Form W–2. Mrs. Kelley also received $817 in qualified dividends from Core Labs in 2017. These dividends were received on Mrs. Kelley's behalf by Solium Capital LLC (Solium), which reported them to Mrs. Kelley and the IRS using Form 1099–DIV, Dividends and Distributions.

On their timely filed joint 2017 Form 1040EZ, Income Tax Return for Single and Joint Filers With No Dependents, the Kelleys reported zero gross income, zero taxable income, and $96,290 in withholdings.[2] The Kelleys accordingly claimed a refund of $96,290. They attached to their return two Forms 4852, Substitute for Form W–2, Wage and Tax Statement, or Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., reporting zero in "wages, tips, and other compensation" from Sanchez Oil & Gas and Core Labs, respectively, but replicating the withholding amounts for federal income tax and payroll taxes that Sanchez Oil & Gas and Core Labs reported on the Forms W–2. On line 9 of their respective Forms 4852 (asking how the taxpayer determined the corrected amounts), Mr. and Mrs. Kelley wrote: "I did not receive any 'wages' as defined in IRC Section 3401(a) and 3121(a)." The Kelleys also attached to their return a document titled "Statement to Correct Incorrectly Reported 1099–DIV Information Return," in which they claimed that "[n]o dividends were received by [Mrs. Kelley] from [Solium] which were connected with any 'trade or business' or otherwise

---

[2] Line 7 of the 2017 Form 1040EZ reads: "Federal income tax withheld from Form(s) W–2 and 1099." The Kelleys crossed out "Federal income tax" and inserted "All monies." $96,290 is the sum of the federal income tax and payroll taxes (i.e., Social Security tax and Medicare tax) withheld by Sanchez Oil & Gas and Core Labs from the Kelleys' 2017 compensation.

**[*3]** constituted gains, profits, or income within the meaning of relevant law."

On July 9, 2018, the IRS sent the Kelleys their claimed refund of $96,290 plus interest.  On May 28, 2019, the IRS issued to the Kelleys a notice of deficiency, determining a $76,565 income tax deficiency[3] and a $19,565 accuracy-related penalty for an underpayment due to a substantial understatement of income tax (substantial understatement penalty).  *See* I.R.C. § 6662(a), (b)(2).  The notice of deficiency based these determinations on the Forms W–2 from Sanchez Oil & Gas and Core Labs and the Form 1099–DIV from Solium.  The first page of the notice of deficiency lists an "AUR control number," referring to the IRS's automated underreporter program (AUR), as further explained *infra* p. 6.

In the Commissioner's Answer to the Petition, he conceded that the Kelleys are not liable for the substantial understatement penalty. He represented that the IRS official who made the initial determination to assess that penalty did not obtain the written supervisory approval required by section 6751(b)(1).  However, the Answer newly asserted an accuracy-related penalty under section 6662(a) and (b)(1) for an underpayment due to negligence or disregard of rules or regulations (negligence/disregard penalty).  The Answer was signed by both Yvette Nunez, the IRS attorney initially assigned to the Kelleys' case, and Paul Feinberg, Ms. Nunez's immediate supervisor at the time.

## OPINION

I.    *Burden of Proof*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.  *See* Rule 142(a);

---

[3] This deficiency amount appropriately does not include the payroll taxes refunded to the Kelleys.  *See* I.R.C. § 6211 (defining "deficiency" to encompass only income, gift, estate, and certain excise taxes).  Moreover, since this is a deficiency proceeding, we do not have jurisdiction over those payroll taxes.  *See* I.R.C. § 6214(a) (granting the Tax Court "jurisdiction to redetermine the correct amount of the *deficiency*" (emphasis added)); *see also Ietto v. Commissioner*, T.C. Memo. 1996-332, 72 T.C.M. (CCH) 166, 166 ("The United States Tax Court is a court of limited jurisdiction. Generally, this jurisdiction is limited to income, estate, gift, and certain excise taxes which are subject to the deficiency notice requirements of sections 6212(a) and 6213(a). This Court has no jurisdiction over FICA [i.e., payroll] taxes imposed on an employee." (Citations omitted.)).

[*4] *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In cases of unreported income, the Commissioner must establish an evidentiary foundation connecting the taxpayer with the income-producing activity or otherwise demonstrate that the taxpayer actually received income. *See Portillo v. Commissioner*, 932 F.2d 1128, 1133–34 (5th Cir. 1991), *aff'g in part, rev'g in part* T.C. Memo. 1990-68; *Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). Once the Commissioner makes the required threshold showing, the burden typically shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. *See Portillo v. Commissioner*, 932 F.2d at 1133–34; *Walquist*, 152 T.C. at 67–68. The Commissioner's threshold showing generally must include "reasonable and probative information" beyond a mere third-party information return, such as a Form W–2 or Form 1099–DIV. *See* I.R.C. § 6201(d); *see also Portillo v. Commissioner*, 632 F.2d at 1134.

Even if the Commissioner makes the required threshold showing with respect to an alleged item of unreported income, he will retain the burden of proof with respect to that item if the taxpayer (1) introduces credible evidence that he did not receive the income and (2) has maintained all statutorily required records and cooperated with the Commissioner. I.R.C. § 7491(a). Additionally, the Commissioner always bears the initial burden of production with respect to any asserted penalty against an individual. I.R.C. § 7491(c). Accordingly, the Commissioner must come forward with sufficient evidence that it is at least prima facie appropriate to impose the penalty. *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Moreover, in a case like this one, where the Commissioner asserts a penalty in an answer (rather than the notice of deficiency), the Commissioner bears the full burden of proof regarding the penalty, including the taxpayer's lack of reasonable cause or any other applicable affirmative defense. *See* Rule 142(a)(1); *Estate of Hoensheid v. Commissioner*, T.C. Memo. 2023-34, at *47; *Full-Circle Staffing, LLC v. Commissioner*, T.C. Memo. 2018-66, at *42–43, *aff'd in part, appeal dismissed in part*, 832 F. App'x 854 (5th Cir. 2020).

II.    *Procedural Validity of the Notice of Deficiency*

The Kelleys raise the jurisdictional issue of whether the notice of deficiency was validly issued, since it does not bear the name of any IRS officer or employee. As we have repeatedly held, "[a] valid petition is the basis of the Tax Court's jurisdiction. To be valid, a petition must be filed from a valid statutory notice." *Stamm Int'l Corp. v. Commissioner*, 84 T.C. 248, 252 (1985) (first citing *Midland Mortg. Co. v. Commissioner*,

**[*5]** 73 T.C. 902, 907 (1980); and then citing *McCue v. Commissioner*, 1 T.C. 986, 988 (1943)).

Section 6212(a) authorizes the "Secretary" to send a notice of deficiency if she "*determines* that there is a deficiency in respect of any tax." (Emphasis added.) (Section 7701(a)(11)(B) provides that the term "Secretary," as used in the Code, means "the Secretary of the Treasury or [her] delegate.") The U.S. Court of Appeals for the Fifth Circuit[4] has indicated that such a determination means "a thoughtful and considered determination that the United States is entitled to an amount not yet paid." *Portillo v. Commissioner*, 932 F.2d at 1132 (quoting *Scar v. Commissioner*, 814 F.2d 1363, 1369 (9th Cir. 1987), *rev'g* 81 T.C. 855 (1983)). The Fifth Circuit further indicated that "the word 'determination' irresistibly connotes consideration, resolution, conclusion, and judgment." *Id.* (quoting *Terminal Wine Co. v. Commissioner*, 1 B.T.A. 697, 701 (1925)).

Section 7701(a)(12)(A) clarifies that the Secretary of the Treasury's (Secretary) powers may be delegated both directly and "indirectly by one or more redelegations of authority." The Secretary has delegated the authority to determine deficiencies and to issue notices of deficiency to the Commissioner and to IRS district directors, directors of service centers, and regional directors of appeals. *See* Treas. Reg. § 301.6212-1(a); Treas. Order 150-10 (Apr. 22, 1982). Moreover, Treasury Regulation § 301.7701-9(c) authorizes the Commissioner to redelegate these powers to other officers or employees under his supervision and control and to authorize further delegation of these powers by his delegates. The Commissioner has redelegated the authority to issue notices of deficiency to various managers, directors, and other officials of the IRS, identified by job title. *See* I.R.S. Deleg. Order 4-8 (Rev. 1), *Internal Revenue Manual* (IRM) 1.2.43.9 (Sept. 4, 2012).

The notice of deficiency sent to the Kelleys does not list the name of any IRS officer or employee but does bear an "AUR control number."

---

[4] This Court follows a court of appeals decision that is squarely in point if appeal from our decision lies to that court of appeals alone. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). Appeal of the present case would lie exclusively to the Fifth Circuit, absent a stipulation by the parties to the contrary. *See* I.R.C. § 7482(b)(1)(A).

**[\*6]** *See* IRM 4.19.2 (Aug. 7, 2018) ("IMF Automated Underreporter (AUR) Control").[5]  The IRM explains:

> Potential AUR cases are systemically identified through computer matching of tax returns with corresponding Information Returns Master File (IRMF) payer information documents.  Cases are selected for inventory in a manner determined to provide overall compliance coverage.  Selected cases undergo an in-depth review by a tax examiner to identify underreported and/or over-deducted issues which require further explanation to resolve the discrepancy.

IRM 4.19.3.1.1 (Aug. 22, 2017).

The Kelleys point out that the AUR is not listed as a delegate in Delegation Order 4-8.  They further contend that computer algorithms are not capable of "thoughtful and considered determination," nor of "consideration, resolution, conclusion, and judgment."  *Portillo v. Commissioner*, 932 F.2d at 1132.  However, the IRM specifies:

> Tax examiners perform an in-depth analysis of each case [flagged by the AUR] and determine if the discrepant income or deduction(s) in question are satisfactorily identified or addressed on the tax return.  If so, they close the case.  If reasonable doubt remains, they send the [taxpayer] either:
>
> - An AUR Notice, CP 2000 or
>
> - An Initial Contact Letter, CP 2501

IRM 4.19.3.2(11) (Dec. 15, 2017).  By reason of the presumption of regularity, we presume that the IRS followed these provisions of the IRM when issuing to the Kelleys first a CP 2501, then a CP 2000, and finally a notice of deficiency.[6]  "The presumption of regularity supports

---

[5] Citations of provisions of the IRM relating to the AUR are of those provisions in effect when the notice of deficiency was issued (viz, May 28, 2019).

[6] No CP 2501 is in the record.  However, the record includes the first page of a CP 2000 addressed to the Kelleys and dated March 11, 2019.  The CP 2000 states in part: "Thank you for your response to our previous notice.  Based on your response, we've determined you owe $122,392 . . . ."  It is evident that the Kelleys had received a prior notice and responded and that the Commissioner, through his authorized delegates, considered their response before issuing the notice of deficiency.

**[\*7]** the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926). A corollary principle is that "all necessary prerequisites to the validity of official action are presumed to have been complied with, and that where the contrary is asserted it must be affirmatively shown." *Lewis v. United States*, 279 U.S. 63, 73 (1929); *see also Harriss v. Commissioner*, T.C. Memo. 2021-31, at *10. Given these presumptions, we find by a preponderance of the evidence that the notice of deficiency sent to the Kelleys reflected a "thoughtful and considered determination," made by a duly authorized delegate of the Secretary, that the Kelleys understated the amount of tax due on their 2017 return.

We thus hold that the notice of deficiency is valid and that we have jurisdiction over this case.

III. *2017 Gross Income*

The Kelleys do not dispute receiving the amounts reported on the Forms W–2 from Sanchez Oil & Gas and Core Labs and the Form 1099–DIV from Solium. The Kelleys do not dispute that the payments from Sanchez Oil & Gas and Core Labs were made in exchange for the Kelleys' labor, nor that the payments reported by Solium were corporate dividends. They make no contention that any of these amounts constituted a gift, a loan repayment, or any other transaction that falls within an exclusion from gross income.

Gross income is generally defined by section 61 as "income from whatever source derived." The Supreme Court long ago established that gross income includes all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion," absent an explicit exclusion. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). The Court in *Glenshaw Glass* clarified that gross income is not limited to "the gain derived from capital, from labor, or from both combined." *Id.* at 430–31 (quoting *Eisner v. Macomber*, 252 U.S. 189, 207 (1920)). Here, the evidence clearly shows that all the amounts reported on the Forms W–2 and Form 1099–DIV were unexcluded, realized accessions to the Kelleys' wealth—and, in fact, that these amounts were gains derived from their capital and/or labor. Therefore, we find by a preponderance of the evidence that all these amounts were gross income that the Kelleys should have reported on their 2017 tax return. It is irrelevant whether the burdens of production or proof

[*8] shifted to the Commissioner under section 6201(d) or 7491(a). *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008) ("In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof."), *supplementing* T.C. Memo. 2007-340.

## IV.   *Section 6662(a) Penalty*

### A.   *Section 6751(b)(1) Supervisory Approval*

#### 1.   *Timing of Approval*

Section 6751(b)(1) provides that "[n]o penalty under this title [i.e., the Code] shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." This Court has held that section 6751(b)(1) requires supervisory approval to be procured before the first formal communication to the taxpayer of the decision to assert the penalty at issue. *See, e.g., Clay v. Commissioner*, 152 T.C. 223, 249 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).

Here, in the notice of deficiency, the Commissioner determined a substantial understatement penalty. The Commissioner conceded that penalty in his Answer, stating that the IRS official who initially determined the penalty did not obtain written supervisory approval. The Answer newly asserted a negligence/disregard penalty. Moreover, the Answer was signed by both Ms. Nunez, the IRS attorney who drafted the Answer, and Mr. Feinberg, her immediate supervisor. Thus, before the first formal communication to the Kelleys regarding the negligence/disregard penalty, that penalty had been approved by the immediate supervisor of the official who proposed it.[7]

---

[7] The IRS sent the Kelleys a Notice CP 2000, or "30-day letter," on March 11, 2019, before issuing the notice of deficiency. The record includes only the first page of the CP 2000, but that page contains the entire "Summary of proposed changes." Within that summary, only one penalty is listed: "Substantial tax understatement penalty." Because that phrase reasonably corresponds only to the substantial understatement penalty, we are satisfied that the Commissioner did not formally communicate his decision to assert the negligence/disregard penalty until he filed the Answer. Below we discuss whether the Commissioner's earlier communication regarding the substantial understatement penalty precluded the later communication regarding the negligence/disregard penalty from satisfying the section 6751(b)(1) requirement.

**[\*9]**          2.          *Individuation of Penalties Under Section 6662*

The Kelleys do not agree that the negligence/disregard penalty asserted in the Answer was asserted for the *first time* in the Answer, in light of the wording and structure of section 6662. Section 6662(a) imposes a penalty equal to 20% of any portion of an underpayment of tax attributable to "1 or more of" the eight causes listed in section 6662(b). Accordingly, even if more than one of the causes applies to a given portion of an underpayment, the taxpayer must pay an additional 20% of that portion only once. *See* Treas. Reg. § 1.6662-2(c).[8] On the face of the statute, then, section 6662(a) imposes a single penalty, albeit one whose rationale may differ between taxpayers, or between different portions of a particular taxpayer's overall underpayment. If this interpretation of the statute is correct, then the Commissioner's assertion of a penalty in the Answer (under section 6662(a) by reason of subsection (b)(1)) was *not* the "initial determination" of that penalty, since it had already been determined (albeit by reason of subsection (b)(2)) in the notice of deficiency. Accordingly, Mr. Feinberg's approval of Ms. Nunez's draft of the Answer would not suffice for purposes of section 6751(b)(1).

However, we cannot accept the Kelleys' interpretation of what constitutes "the penalty" under section 6662 (at least for purposes of section 6751(b)(1)). The Kelleys' interpretation would give carte blanche to IRS officials to assert additional causes under section 6662(b) after a supervisor approved a penalty under one or more other causes. For instance, an IRS revenue agent might get approval to penalize a taxpayer by reason of section 6662(b)(1) (negligence or disregard of rules or regulations) but, upon receiving convincing rebuttal from the taxpayer, assert a penalty by reason of section 6662(b)(3) (substantial valuation misstatement)—perhaps even enhanced to a 40% penalty for gross valuation misstatements under section 6662(h). If the Kelleys are correct, then the revenue agent would not need further supervisory approval for the second penalty assertion, because the second penalty would be the "same" as the first (approved) penalty.

---

[8] The penalty is increased to 40% of the relevant portion of the underpayment if at least one of the causes is a "gross valuation misstatement" (as defined in section 6662(h)) or a "nondisclosed noneconomic substance transaction" (as defined in section 6662(i)), neither of which is at issue in this case. However, the same "nonstacking" principle governs: The 40% penalty is imposed only once, regardless of how many of the eight causes under section 6662(b) apply.

**[*10]** This result would fly in the face of Congress's stated purpose in enacting section 6751(b)(1): to ensure that penalties "only be imposed where appropriate and not as a bargaining chip." *Williams v. Commissioner*, 151 T.C. 1, 8 (2018) (quoting S. Rep. No. 105-174, at 65 (1998), *as reprinted in* 1998-3 C.B. 537, 601). The revenue agent in our example would have free rein to use the second penalty assertion (and further assertions as needed), even if unjustified, to encourage the taxpayer to settle. This posturing is precisely what Congress evidently sought to prevent. *See Chai v. Commissioner*, 851 F.3d 190, 219 (2d Cir. 2017), *aff'g in part, rev'g in part* T.C. Memo. 2015-42. Indeed, we have repeatedly held that if the first formal communication of penalties to a taxpayer indicates a section 6662(a) penalty by reason of some of the section 6662(b) causes but not others, then the Commissioner is barred from later asserting a penalty by reason of any of the initially excluded causes without further supervisory approval. (He would not be so barred if all the section 6662(b) causes amounted to the "same" penalty.) *See, e.g., Conrad v. Commissioner*, T.C. Memo. 2023-100, at *82–83; *Estate of Ronning v. Commissioner*, T.C. Memo. 2019-38, at *12–13, *45–46, *aff'd*, 830 F. App'x 279 (11th Cir. 2020); *see also Palmolive Bldg. Invs., LLC v. Commissioner*, 152 T.C. 75, 87 (2019) ("Although the title of section 6662 refers to a (singular) 'penalty', section 6662 imposes various distinct penalties, each subpart of which must be separately approved for purposes of section 6751(b)(1)."); *McCarthy v. Commissioner*, T.C. Memo. 2020-74, at *26–29 (finding the supervisory approval requirement unmet for the penalty under section 6662(a) and (b)(2) when the alleged approval stated simply "6662 penalty approved" without identifying any causes under section 6662(b)).

We therefore hold that each of the eight causes of an underpayment listed in section 6662(b) yields a distinct penalty for purposes of the supervisory approval requirement under section 6751(b)(1). Accordingly, the Commissioner was on firm procedural ground in asserting the negligence/disregard penalty against the Kelleys after determining the substantial understatement penalty without supervisory approval.

3. *Authority to Assert Penalty*

Section 6214(a) impliedly authorizes the Secretary and her delegates to assert penalties in pleadings before this Court.[9] The

---

[9] Section 6214(a) provides, in relevant part, that "the Tax Court shall have jurisdiction to . . . determine whether any additional amount, or any addition to the

**[\*11]** Commissioner is a delegate of the Secretary for this purpose, and the IRS Chief Counsel is likewise a delegate of the Commissioner. *See* I.R.C. § 7803(b)(2)(D) (authorizing the Chief Counsel "to represent the Commissioner in cases before the Tax Court"). Therefore, Ms. Nunez had authority, as a Chief Counsel attorney, to make the "initial determination" of the negligence/disregard penalty against the Kelleys in the Answer, such that Mr. Feinberg's signature on the Answer satisfied the requirement of section 6751(b)(1).

The Kelleys contend that attorneys in the IRS Office of Chief Counsel lack authority to assert penalties. They refer us to *Graev v. Commissioner*, 149 T.C. 485, 527–34 (2017) (Buch, J., concurring in part and dissenting in part), *supplementing and overruling in part* 147 T.C. 460 (2016), where Judge Buch argued that Chief Counsel attorneys lack delegated authority to issue notices of deficiency and therefore may not make the "initial determination" of a penalty asserted in such a notice. That argument has no applicability here; this case does not involve Chief Counsel attorneys issuing a notice of deficiency. Rather, here, the Chief Counsel attorney asserted penalties for the first time in the Answer filed in this Court. We have held that the Chief Counsel or his delegates (i.e., attorneys in the IRS Office of Chief Counsel) are authorized, by virtue of their role as the Commissioner's representatives in this Court, *see* I.R.C. §§ 7803(b), 7452, to assert penalties in an answer. "It is well established that the Commissioner may assert penalties in his answer." *Koh v. Commissioner*, T.C. Memo. 2020-77, at \*5 (first citing I.R.C. § 6214(a); then citing *Chai v. Commissioner*, 851 F.3d at 221; and then citing *Graev*, 149 T.C. 485). "It follows that his representative in this Court also has this authority." *Id.* (first citing *Roth v. Commissioner*, T.C. Memo. 2017-248, at \*11, *aff'd*, 922 F.3d 1126 (10th Cir. 2019); then citing Rule 142(a); then citing *Graev*, 149 T.C. at 491–92, 498; and then citing *Estate of Jung v. Commissioner*, 101 T.C. 412, 448 (1993)). Thus, we reject the Kelleys' argument.

B. *"Underpayment"*

Section 6662(a) imposes a penalty equal to 20% of any underpayment of tax attributable to one or more of the eight causes listed in section 6662(b). Section 6664(a) defines "underpayment" of a

---

tax should be assessed, if claim therefor is asserted by the Secretary *at or before the hearing or a rehearing*." (Emphasis added.)

**[\*12]** particular tax to mean the amount by which the correct amount of the tax exceeds the excess of

> (1) the sum of—
>> (A) the amount shown as tax by the taxpayer on his return, plus
>> (B) amounts not so shown [but] previously assessed (or collected without assessment),[10] over
> (2) the amount of rebates [already] made [with respect to the tax period at issue].

"Rebates" include abatements, credits, and refunds. Treas. Reg. § 1.6664-2(e).

Here, given our determination of unreported gross income, the Kelleys had an underpayment for their 2017 tax year within the meaning of section 6664(a): Their correct tax liability was well above the zero tax liability reported on their return (and the record indicates no amounts previously assessed or collected without assessment). For clarity, we emphasize that the Kelleys had an underpayment at the time they submitted their return; when they requested and received a refund of the withholdings made by Sanchez Oil & Gas and Core Labs, their underpayment increased.

C. *Negligence and Disregard*

Section 6662(a) and (b)(1) imposes a penalty for an underpayment of tax attributable to "[n]egligence or disregard of rules or regulations." Section 6662(c) provides that for this purpose, "the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title [i.e., the Code], and the term 'disregard' includes any careless, reckless, or intentional disregard."

The Kelleys' failure to report the amounts shown as gross income on the Forms W–2 and Form 1099–DIV was a clear disregard of the clear rule that gross income includes "all income from whatever source derived." I.R.C. § 61(a); *see also* Treas. Reg. § 1.61-1(a) ("Gross income

---

[10] Amounts are considered "previously assessed" only if the IRS assessed those amounts before the taxpayer filed a return, such as occurs with jeopardy assessments under section 6861. *See* Treas. Reg. § 1.6664-2(d). The amount considered "collected without assessment" is only the unrefunded and uncredited portion of the excess (if any) of tax payments made before the filing of the return (including wage withholding and estimated tax payments) over the tax shown on the return. *Id.* On the basis of the record, neither of these definitions applies to the Kelleys' 2017 income tax.

**[\*13]** means all income from whatever source derived, unless excluded by law."). The general definition of taxable "gross income" in section 61 explicitly includes "[c]ompensation for services . . . [and] [d]ividends." I.R.C. § 61(a)(1), (7). The Code could not have more clarity. For the Kelleys, gross income included the compensation from Sanchez Oil & Gas and Core Labs and the dividends reported by Solium, and the Kelleys were at least careless in disregarding the rules requiring them to report these amounts.

D.    *Adequate Disclosure and Reasonable Basis*

The Kelleys believe that they qualify for the exception to the section 6662(a) penalty by virtue of their making an adequate disclosure in their return. Treasury Regulation § 1.6662-3(c) excuses a taxpayer's disregard of rules or regulations if the underpayment is attributable to a position that the taxpayer adequately disclosed on the return. Treas. Reg. §§ 1.6662-3(c), 1.6662-7. However, the disclosure must be made using Form 8275, Disclosure Statement, or Form 8275–R, Regulation Disclosure Statement, *see* Treas. Reg. § 1.6662-3(c)(1), neither of which the Kelleys filed with their return. In any event, the adequate disclosure exception does not apply if the taxpayer's position lacks a "reasonable basis." *Id.* Reasonable basis is defined as "a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim." *Id.* para. (b)(3). Thus, although the reasonable basis standard is less stringent than the "substantial authority" standard of section 6662(d)(2)(B)(i), *see* Treas. Reg. § 1.6662-4(d)(2), it is nonetheless an objective criterion, based on the actual terrain of relevant legal authorities and not on the taxpayer's degree of knowledge or personal circumstances.[11]

The Kelleys point to the fact that on their Forms 4852 they wrote: "I did not receive any 'wages' as defined in IRC Section 3401(a) and 3121(a)." Further, on the document attached to their return entitled "Statement to Correct Incorrectly Reported 1099–DIV Information Return," they claimed that "[n]o dividends were received by [Mrs. Kelley] from [Solium] which were connected with any 'trade or business' or otherwise constituted gains, profits, or income within the meaning of

---

[11] These latter subjective factors are relevant to the reasonable cause exception, discussed below.

**[\*14]** relevant law." Again, the Kelleys failed to use the prescribed form of disclosure (i.e., Form 8275 or 8275–R).

Furthermore, as to their attempted disclosure regarding wages, the Kelleys presented no plausible argument—whether on their return or in this litigation—that the payments from Sanchez Oil & Gas and Core Labs did not qualify as wages under section 3401(a) or 3121(a). Those sections define "wages" for purposes of income tax withholding and payroll taxes, respectively. Section 3401(a) defines "wages" as "remuneration . . . for services performed by an employee for his employer," while section 3121(a) defines "wages" as "all remuneration for employment." Section 3401(c) provides that "the term 'employee' includes an officer, employee, or elected official of the United States, a State, or any political subdivision thereof." Section 3121(b) generally defines the term "employment" within that section to mean services performed within the United States or services performed outside the United States by a U.S. citizen; section 3121(e)(2) provides that "[t]he term 'United States' . . . includes the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and America Samoa." The Kelleys imply that because they did not work for a government entity, and because they did not perform their work in one of the listed American territories, the payments from Sanchez Oil & Gas and Core Labs did not fall under the definition of "wages" in either section 3401 or section 3121.

However, section 7701(c) clarifies that "[t]he terms 'includes' and 'including' when used in a definition contained in this title [i.e., the Code] shall not be deemed to exclude other things otherwise within the meaning of the term defined." Workers for private companies are undeniably within the meaning of "the term defined" in section 3401(c) (employee), and the 50 states of the United States are undeniably within the meaning of "the term defined" in section 3121(e) (United States). There is no reasonable basis for contending that, in 2017, the Kelleys did not receive "wages" for services performed within the "United States" as those terms are defined for purposes of income tax withholding and payroll taxes.

Additionally, the payments the Kelleys received from Sanchez Oil & Gas and Core Labs were "compensation for services," which is explicitly included in gross income by section 61(a)(1). The Kelleys do not dispute that they performed work for Sanchez Oil & Gas and Core Labs, nor that the payments from Sanchez Oil & Gas and Core Labs were given in exchange for that work. Thus, those payments fall under

[*15] the plain meaning of "compensation for services" (a phrase that is not specially defined in the Code or the regulations).

The Kelleys attempt to exclude the Sanchez Oil & Gas and Core Labs payments from gross income by pointing to two alleged statutory precedents to the current section 61: the Classification Act of 1923, ch. 265, 42 Stat. 1488, and the Revenue Act of 1938, ch. 289, § 22(a), 52 Stat. 447, 457. The definition of "compensation" in section 2 of the Classification Act of 1923 was restricted to amounts paid to federal government employees. However, that Act (which was repealed by the Classification Act of 1949, ch. 782, 63 Stat. 954) by its terms provided only for the creation of compensation schedules for certain federal employees; it was emphatically not a tax bill. The Kelleys point out that the Classification Act of 1923 was still in effect when the Revenue Act of 1938 was enacted and that section 22 of the latter defined "gross income" to "include[] gains, profits, and income derived from salaries, wages, or compensation." The Kelleys evidently believe that Congress must have intended "compensation" to bear the same definition in the Revenue Act of 1938 as it bore in the Classification Act of 1923 and that that definition was carried forward to the current section 61 of the Code.

But this contention has no reasonable basis in the canons of statutory construction consistently applied by the courts of this country. As the Supreme Court has explained "many times over many years . . . when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1749 (2020). The term "compensation for services," as used in both the Revenue Act of 1938 and the current section 61, is undefined, and we therefore accord it its plain meaning—viz, any type of payment or remuneration given in exchange for labor. *See, e.g.*, *Compensation*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/compensation (last updated Oct. 16, 2023); *Service*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/service (last visited Oct. 19, 2023). It would be bizarre if Congress, once it gave a special definition for a term in a particular context, were then forever barred from using that term in its ordinary meaning.

As to the Kelleys' attempted disclosure regarding dividends, they apparently believe that dividends must be connected with a "trade or business" in order to be taxable. However, this is contrary to the plain

**[\*16]** text of section 61(a)(7), which includes no such qualifier. The Kelleys never clarified on their return or in this litigation why the definition of "trade or business" is relevant to determining whether the Core Labs dividends are taxable.[12] Likewise, their argument that dividends from Solium are not taxable because Solium is a "global company" has no discernible basis in legal authority. (Moreover, the record indicates that both Solium and Core Labs are registered to do business in the United States and/or are doing business here.)

The Kelleys have made various other contentions resembling the sorts of frivolous tax-protester arguments that we have dismissed on many previous occasions. Although we could diagnose the patent faults of these further arguments in detail, we generally decline to refute frivolous arguments "with somber reasoning and copious citation of precedent; to do so might suggest that these arguments have some colorable merit." *Funk v. Commissioner*, 123 T.C. 213, 217 (2004) (quoting *Crain v. Commissioner*, 737 F.2d 1417, 1417 (5th Cir. 1984)). In *Wnuck v. Commissioner*, 136 T.C. 498, 501–13 (2011), we explained at length why we generally decline to refute tax-protester arguments, and we explained the fallacies of the precise argument regarding section 3121(a) that the Kelleys advance here.

The arguments offered by the Kelleys do not constitute a reasonable basis for their underpayment and so do not afford them the protection of the adequate disclosure exception.

E.    *Reasonable Cause Exception*

Section 6664(c)(1) provides a further exception to the negligence/disregard penalty "if it is shown that there was a reasonable cause for such portion [of the underpayment] and that the taxpayer acted in good faith with respect to such portion." The determination as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, considering all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). Generally, the most important factor in determining the existence of reasonable cause is the

---

[12] At any rate, Core Labs' 2019 registration statement with the U.S. Securities and Exchange Commission—a copy of which the Kelleys provided to this Court—states in relevant part that Core Labs "is an oil-services company that helps oil and gas companies better understand how to improve production levels and economics with core and reservoir analysis. Additionally, the company sells a number of products helping its customers to maximize production levels from their oil and gas assets." Core Labs clearly was conducting a trade or business.

**[\*17]** taxpayer's effort to ascertain his or her correct tax liability. *Id.* Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.*

The Kelleys explained in this litigation that they conducted a significant amount of research into current and historical tax law and concluded that (1) labor compensation paid by private firms is not taxable and (2) dividends reported by a company that conducts business globally are not taxable. These erroneous conclusions conceivably could reflect misunderstanding of the law, but they are nonetheless manifestly unreasonable in light of the Kelleys' educational backgrounds and knowledge of tax law.

For instance, the Kelleys rely on congressional history to make their case. They direct us to a portion of the 1943 Congressional Record in which Congressman Frank Carlson, in the course of debate on the Individual Income Tax Collection Bill of 1943, H.R. 2218, 78th Cong. (an amended version of which was enacted as the Current Tax Payment Act of 1943, ch. 120, 57 Stat. 126), stated the following:

> The income tax is, therefore, not a tax on income as such. It is an excise tax with respect to certain activities and privileges which is measured by reference to the income which they produce. The income is not the subject of the tax: it is the basis for determining the amount of tax.

89 Cong. Rec. 2578–80 (1943) (statement of Rep. Frank Carlson). Congressman Carlson's remarks here are part of an extended quotation of an "early history of the income-tax law" written by a former legislative draftsman for the Treasury Department, which Congressman Carlson excerpted primarily to show that an early version of the federal income tax provided for withholding at the source. The Kelleys nonetheless imply that Congressman Carlson intended to represent that the income tax does not encompass income from labor in general. However, we note first that legislative history is not to be consulted unless the statutory text is ambiguous, which is not the case with respect to section 61(a)(1). *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Secondly, the quoted text actually clarifies that gross income is "the basis for determining the amount of tax." The Kelleys have misinterpreted the Congressman's import. The Kelleys' suggestion

**[\*18]** that the entire U.S. legal system has been mistaken for over 100 years about the taxability of labor compensation is unreasonable.

It was likewise unreasonable for the Kelleys to draw any conclusion about the *taxability* of dividends from a regulation about the *informational reporting* of dividends. The Kelleys cite Treasury Regulation § 1.6042-2(a)(2), which provides that the "person[s]" who must file Form 1099–DIV upon paying dividends (or receiving dividends as nominee for another person) do not include "international organization[s]." The Kelleys note that Solium is a "global company" and thereby conclude that it falls under the exception of Treasury Regulation § 1.6042-2(a)(2). However, section 7701(a)(18) defines "international organization" to mean "a public international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (22 U.S.C. 288–288f)." The record shows that Solium is not such an organization. Moreover, even if Solium were somehow exempt from reporting the Core Labs dividends it received as nominee for the Kelleys, that fact would have no logical bearing on the taxable nature of the dividends in the Kelleys' hands. To the extent the Kelleys believe that U.S. citizens are exempt from tax on foreign-based income, they offered no grounds for deeming that belief to be reasonable. It is well established, and commonly known, that the United States taxes its citizens, living and working here, on their worldwide income, from whatever source derived, domestic or foreign. *See* I.R.C. § 61(a); *Crow v. Commissioner*, 85 T.C. 376, 380 (1985). Furthermore, setting aside the unreasonableness of the Kelleys' apparent conclusion that dividends must be connected with a "trade or business" in order to be taxable, it defies reason to conclude that the Core Labs dividends were not connected with Core Labs' (very evident) trade or business. All of these inferences and misreadings were gravely erroneous and unbefitting for scientific professionals.

Although the Kelleys evidently exerted considerable effort to validate their return positions, the unreasonableness of those positions outweighs the effort. We hold that the Kelleys lack reasonable cause for their careless disregard of the foundational rules of section 61 (regardless of the Commissioner's burden of proof on this issue), and they are liable for the negligence/disregard penalty.

We have considered all the arguments made by the parties, and to the extent they are not addressed herein, we consider them moot, irrelevant, or without merit.

**[\*19]**  To reflect the foregoing,

*Decision will be entered for respondent.*